# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

Carnelius McCall, individually and on behalf
of all others similarly situated,

Plaintiff,

- against -

Publix Super Markets, Inc.,

Defendant

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff,
which are based on personal knowledge:

1.      Publix Super Markets, Inc. ("Defendant") manufactures, labels, markets, and sells
strawberry watermelon water enhancers which purport to be flavored only with natural, and not
artificial flavors, under the Publix brand (the "Product").



## I.    CONSUMER DEMAND FOR NATURAL FLAVORS

2.    Consumers have been increasingly concerned about the ingredients added to what they eat and drink.

3.    According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[1]

4.    According to Paul Manning, chief executive officer and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[2]

5.    According to Consumers Union, over 80% of consumers expect that the word "natural," in almost any context, on a food label means that a food does not contain any artificial ingredients.

6.    Explanations for why consumers prefer foods containing natural, instead of artificial ingredients, are varied.

7.    Many Americans believe products are healthier when artificial ingredients are removed, even in "unhealthy" categories such as snacks, cake mix, and frozen pizza.

8.    A recent survey reported that over 82% of US respondents believe that foods with artificial flavors are less healthy than those promoted as containing natural flavors and/or not containing artificial flavors.

9.    Consumers seek to avoid artificial flavors because they are weary of ingredients which are highly processed with chemical additives and synthetic solvents in laboratories.

10.    According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

11.    One scholar theorized "the preference for natural products appeals to a moral

---

[1] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.
[2] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

ideology and offers a moral satisfaction."[3]

12.     The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[4]

13.     Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[5]

14.     About half of Americans say they seek out natural flavors at least some of the time.

15.     In contrast, artificial flavors were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time.

16.     Nielsen reported that 62% of consumers try to avoid artificial flavors.

17.     New Hope Network concluded that 71% of consumers avoid artificial flavors.

18.     Label Insight determined that 76% of consumers avoid artificial flavors.

19.     A recent survey shows more than three in four people worldwide are convinced that artificial flavors have no place on their ingredient lists.[6]

20.     According to Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors, and would pay more for such foods.

## II.     PRODUCT REPRESENTED AS ONLY CONTAINING NATURAL FLAVORS

21.     Defendant markets the Product with the prominent statements, "STRAWBERRY – WATERMELON," above a picture of five strawberries and two wedges of watermelon in font and packaging in shades of red similar to these fruits.

[3] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147–154. doi:10.1016/j.appet.2004.03.005.
[4] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.
[5] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[6] What 'Natural' Really Means to Consumers GNT Group's Guide to Global Consumer Demands attests importance of natural colors for future-proof products, July 13, 2017.



22.    The representation that the Product's flavor is from "Natural Flavor With Other Natural Flavors" appeals to the more than seven out of ten consumers who avoid artificial flavors.

23.    By identifying the Product as getting its strawberry and watermelon taste from "Natural Flavor With Other Natural Flavors," with pictures of five strawberries and two wedges of watermelon, consumers expect only natural flavoring ingredients will contribute to its taste, because that is what the label says.

24.    Though the ingredients listed include "Natural Flavors," they also include "Malic Acid."

4

**INGREDIENTS:** WATER, <mark>MALIC ACID</mark>, CITRIC ACID, <mark>CONTAINS LESS THAN 2% OF:</mark> GUM ARABIC, <mark>NATURAL FLAVORS</mark>, SUCRALOSE, ACESULFAME POTASSIUM, POTASSIUM CITRATE, SUCROSE ACETATE ISOBUTYRATE, RED 40, NIACINAMIDE, VITAMIN B6, VITAMIN B12, POTASSIUM SORBATE.

25.    Malic acid is the second most predominant ingredient after water.

26.    The amount of malic acid exceeds the other fruit acid, citric acid.

27.    The amount of malic acid exceeds the "Natural Flavors," present in an amount less than two percent.

28.    The ingredient list does not inform consumers that the malic acid used is an artificial ingredient and is used to provide flavoring to the Product.

29.    Instead of listing DL-Malic Acid, the ingredient is identified only as "Malic Acid," in violation of regulations that ingredients must be listed by their specific, and not general name.

### III.   MALIC ACID

30.   A flavor is a substance the function of which is to impart taste. See 21 C.F.R. § 101.22(a)(1) and (3).

31.   Taste is the combination of sensations arising from specialized receptor cells located in the mouth.[7]

32.   Taste can be defined as sensations of sweet, sour, salty, bitter, and umami.

33.   However, limiting taste to five categories suggests that taste is simple, which is not true.

34.   For example, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid). *Id.*

35.   Each of those acids is responsible for unique sensory characteristics of sourness. *Id.*

A.   Flavor Properties of Strawberry and Watermelon

36.   Fruit flavors are the sum of the interaction between sugars, acids, and volatile compounds.[8]

37.   Consumer acceptability of the flavor of strawberries and watermelon is based on their perceived sweetness and tartness, determined by their sugar to acid ratio.

38.   Sugars, mainly glucose and fructose, and their ratio to acids, such as citric and malic acid, determine the sweetness of fruits. *Id.*

39.   Citric acid and malic acid are the most important organic acids in strawberries.

40.   Malic acid is the key acid in watermelon and is thought to play a critical role in developing its sour taste.

---

[7] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).
[8] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

41.     Malic acid provides a tart taste to balance the sweetness of watermelon.

B.   Chemical structure of malic acid

42.     Malic acid (molecular formula C4H6O5) is the common name for 1-hydroxy-1, 2-ethanedicarboxylic acid.

43.     Malic acid has two isomers, or different arrangements of atoms in the molecule, L-malic acid, and D-malic acid. 21 C.F.R. § 184.1069.

44.     An isomer is a molecule sharing the same atomic make-up as another but differing in structural arrangements.[9]

45.     Stereoisomers contain different types of isomers, each with distinct characteristics that separate each other as different chemical entities with different chemical properties. Id.

46.     Stereoisomers differ from each other by spatial arrangement, meaning different atomic particles and molecules are situated differently in any three-dimensional direction by even one degree.

47.     An enantiomers is a type of stereoisomer that is a mirror-image and cannot be superimposed.

48.     It can be helpful to think of enantiomers as right-hand and left-hand versions of the same molecular formula. D-Malic Acid and L-Malic Acid are enantiomers.

49.     Below are skeletal formulas of the enantiomers D-Malic Acid and L-Malic Acid:

---

[9] Dan Chong and Jonathan Mooney, Chirality and Stereoisomers (2019).



50.　　L-malic acid occurs naturally in various fruits and is known for providing sweetness and tartness, among other flavors.

51.　　D-Malic Acid does not occur naturally.

52.　　D-Malic Acid is most commonly found as a racemic mixture of the D isomer and L isomer, DL-Malic Acid, which is commercially made from petroleum products.

## IV.　ADDITION OF DL-MALIC ACID

53.　　When chemical components of a solution are added to that solution, the previous combination of chemicals found in that solution changes.

54.　　Likewise, adding DL-Malic Acid to a solution of natural flavorings containing L-Malic Acid would change the concentration of Malic Acid in the solution and the ratio of total malic acid to sugars in that solution.

55.　　Natural sugars – like glucose, fructose, and sucrose – combined with artificial DL-Malic Acid in a ratio engineered to resemble the natural chemical combination of sugar and L-Malic Acid found in the characterizing strawberry and watermelon flavor of the Product is not equivalent to the natural flavor of those characterizing fruits.

56. A natural chemical combination of sugar and L-Malic Acid, altered by adding artificial DL-Malic Acid, is no longer equivalent to the original chemical combination of sugar and L-Malic Acid, and therefore no longer the natural flavor.

57. Defendant includes DL-Malic Acid to help make the Product taste tart and fruity, like strawberries and watermelon.

58. Defendant adds artificial DL-malic acid to the Product to create, enhance, simulate, and/or reinforce the sweet and tart taste that consumers associate with strawberries and watermelon.

59. Defendant had the option to add naturally extracted L-Malic Acid, naturally manufactured acid such as citric acid, or natural strawberry or watermelon flavor to the Product, but intentionally used artificial DL-Malic Acid because it was likely cheaper or more accurately resembled natural flavors than citric acid or other acids.

60. DL-malic acid is synthetically produced from petroleum in a high-pressure, high-temperature, catalytic process.

61. Since there are natural and artificial types of malic acid, laboratory analysis is required to identify which type was used in the Product.

62. Laboratory analysis concluded the Product contains the artificial, DL-malic acid, instead of natural, L-malic acid.

63. The Product's front label is misleading because it states, "Natural Flavor With Other Natural Flavors," when this statement is false and misleading.

64. The ingredients are declared in a way that is misleading and contrary to law, because Defendant designates the ingredient by its generic name, "Malic Acid," instead of by its specific name, "DL-Malic Acid."

## V.    REQUIREMENTS FOR LABELING

65.    Federal and identical state regulations prohibit false and deceptive identification of the source of a food or beverage's characterizing flavors.

66.    Artificial flavor is defined as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R § 101.22(a)(1).

67.    Natural flavor is defined as "essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents" from fruits or vegetables, "whose significant function in food is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

68.    DL-Malic Acid is not a "natural flavor" as this term is defined by federal and state regulations and is not derived from a fruit or vegetable or any other natural source.

69.    A combination of sugar and DL-Malic Acid in a ratio resembling a fruit flavor cannot be derived from a fruit or vegetable.

70.    A combination of sugar, natural L-Malic Acid, and artificial DL-Malic Acid combined in a way to resemble the natural ratio of sugar and L-Malic Acid found in the characterizing natural flavors of the Product cannot be derived from a fruit or vegetable.

71.    A combination of sugars and artificial DL-Malic Acid engineered to resemble the natural ratio of sugars and natural L-Malic Acid that make up the natural flavor of the characterizing fruits of the Product is not a natural flavor.

72.    The natural flavor of the fruits in controversy is heavily dependent on a specific ratio of sugar and L-Malic Acid, while the Product's flavors depend upon a ratio of sugar and DL-Malic Acid.

73.    DL-Malic Acid could function as a flavor enhancer or PH balancer.

74.    A flavor enhancer is "added to supplement, enhance, or modify the original taste and or aroma of a food without imparting a characteristic taste or aroma of its own." 21 C.F.R. § 170.3(o)(11).

75.    For example, malic acid added to vinegar (ascetic acid) dishes like barbecue pork, coleslaw, or pickled eggs would most likely not fundamentally alter the underlying vinegar flavors.

76.    However, because the flavor imparted by malic acid is a core component of strawberries and watermelon, DL-Malic Acid does not function as a flavor enhancer.

77.    Under these circumstances, artificial DL-Malic Acid fundamentally alters the original combination of sugar and natural L-Malic Acid core to strawberry and watermelon flavors, so that the flavor of the Product is no longer a natural ratio of sugar and L-Malic Acid but instead is an artificial ratio of sugar and DL-Malic Acid.

78.    PH balancers are "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalis, and neutralizing agents." 21 C.F.R. § 170.3(o)(23).

79.    The malic acid used is not a PH balancer because it is not necessary to change or maintain active acidity or basicity in the Product.

80.    Irrespective of the purpose Defendant may claim DL-Malic Acid was added to the Product, it has the same effect on its characterizing flavors.

81.    Defendant does not have the ability to command DL-Malic Acid to only perform certain functions and is not allowed to decide which malic acid constitutes flavor and which malic acid constitutes only a flavor enhancer or PH balancer.

82.    The Product's primary or "characterizing" flavors are strawberry and watermelon. 21 C.F.R. § 101.22.

83.   The Product's label makes "direct or indirect representations" about its characterizing flavors, through words, "Strawberry" and "Watermelon," a vignette of five strawberries and two slices of watermelon, and its red fonts and packaging. 21 C.F.R. § 101.22(i).

84.   Federal and state regulations require the Product to disclose whether its characterizing strawberry and watermelon flavor is from strawberries and watermelon, natural sources other than strawberries and watermelon, and/or from artificial, chemical sources, such as DL-Malic Acid, from petroleum. 21 C.F.R. § 101.22(i).

85.   Since the Product contains artificial flavor, DL-Malic Acid, that simulates, resembles and reinforces the characterizing strawberry and watermelon flavor, the name of the characterizing flavors "shall be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Strawberry and Watermelon Flavored." 21 C.F.R. § 101.22(i)(2).

86.   The statement, "Natural Flavor With Other Natural Flavors," the omission of any reference to artificial flavors on the front label and ingredient list, the statement, "Strawberry – Watermelon," "Natural Flavor With Other Natural Flavors," the pictures of strawberries and watermelon, and the red packaging, caused consumers like Plaintiff to expect only natural flavors.

87.   Consumers are unable to learn the malic acid listed in the ingredients is the artificial version without a chemistry kit.

88.   Defendant is required to tell consumers if it used the artificial version, instead of only using the generic name.

89.   The Product's strawberry and watermelon flavor containing DL-Malic Acid resembles the natural characterizing flavors represented to be used.

90.   Plaintiff purchased the Product because the packaging claimed it contained "Natural Flavor With Other Natural Flavors" to provide its strawberry and watermelon taste.

91.     Plaintiff would not have been able to understand that the statement, "Natural Flavor With Other Natural Flavors," was not true and was misleading, without an advanced understanding of organic chemistry and without performing chemical analysis on the Product.

92.     Plaintiff was unaware that the Product contained artificial DL-Malic Acid when she purchased it, and that this ingredient affected its characterizing flavors.

93.     Plaintiff was deceived into paying money for a product she did not want or would want less, because the Product was labeled with "Natural Flavor With Other Natural Flavors," which she understood to mean its taste was provided only by natural, and not artificial, flavoring ingredients.

94.     Worse than the lost money, Plaintiff was deprived of her protected interest to choose the foods and ingredients she ingests.

95.     Plaintiff is not, and should not be, required to chemically test the food products she purchases to know their true contents.

96.     Defendant, and not Plaintiff, knew or should have known that the statement, "Natural Flavor With Other Natural Flavors," was false, deceptive, and misleading, and that Plaintiff would not be able to tell the Product contained artificial DL- Malic Acid unless Defendant expressly told her, as required by law.

97.     Defendant employs professional chemists to create the chemical flavor formula of the Product.

98.     Therefore, Defendant through its employees, knew or should have known that DL-Malic Acid is not naturally occurring, and that by adding DL-Malic Acid to the Product, the natural flavoring, if any were ever actually added, would be fundamentally changed.

99.     Defendant knew that DL-Malic Acid would contribute to the tart and fruity

strawberry and watermelon taste, and that it was used to enhance the taste of strawberries and watermelon.

100.   On information and belief, Defendant through their employees did know that DL-Malic Acid was not naturally occurring and would fundamentally alter any natural combination of sugar and L-Malic Acid in the Product but chose to include DL-Malic Acid because it was cheaper for Defendant than using natural L-Malic Acid and because it did not believe its customers were educated enough to know the difference.

## VI.   CONCLUSION

101.   Defendant makes other representations and omissions with respect to the Product which are false or misleading.

102.   Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

103.   The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

104.   Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

105.   Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

106.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $1.99 for 1.62 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

107.   Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

108.   The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

109.   Plaintiff Carnelius McCall is a citizen of Alabama.

110.   Defendant Publix Super Markets, Inc. is a Florida corporation with a principal place of business in Lakeland, Polk County, Florida.

111.   The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

112.   The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

113.   The Product is available to consumers from Defendant's retail stores and its website.

114.   Venue is in the Tampa Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Polk County, i.e., Defendant's decisions for labeling the Product.

Parties

115.   Plaintiff Carnelius McCall is a citizen of Bessemer, Jefferson County, Alabama.

116.   Defendant Publix Super Markets, Inc. is a Florida corporation with a principal place of business in Lakeland, Florida, Polk County.

117.   Publix supermarkets were founded in 1930 by George W. Jenkins.

118.   Since its founding, the company has stayed true to its founder's philosophy of

treating employees and customers like family.

119.   Publix is the largest employee-owned company in the United States.

120.   Every year, Publix is hailed as the No. 1 supermarket for customer satisfaction, one of Fortune's "100 Best Companies to Work For," and a model for its sustainability efforts and community involvement.

121.   Publix ranks No. 1 on Fortune's 'World's Most Admired Companies' in the food store category.

122.   These rankings are based on evaluations by Publix workers and others in its industry, in areas from investment value to social responsibility.

123.   Publix is one of a handful of grocery chains in the United States with over 1,000 locations.

124.   Publix operates throughout the Southeastern United States, with locations in Florida, Georgia, Alabama, South Carolina, Tennessee, North Carolina, and Virginia.

125.   Consumers choose Publix because it embodies its well-known slogan, "Where Shopping Is a Pleasure," based on its convenience, cleanliness, ease of navigation, friendly workers and its private label products.

126.   While Publix stores sell leading national brands, they sell a large number of products under one of their private label brands, Publix.

127.   Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

128.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

129.   Products under the Publix brand have an industry-wide reputation for quality and

value.

130.  In releasing products under the Publix brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

131.  Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

132.  That Publix branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

133.  Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

134.  A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

135.  Private label products under the Publix brand benefit by their association with consumers' appreciation for the Publix brand as a whole.

136.  The development of private label items is a growth area for Publix, as they select only top suppliers to develop and produce Publix products.

137.  The Product is available to consumers from Defendant's retail stores and its website.

138.  Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Publix, at locations including 4965 Promenade Pkwy, Bessemer, AL 35022 between February 13, 2021 and September 13, 2021, and/or among other times.

139.  Plaintiff believed the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

140.   Plaintiff bought the Product because she expected it contained only natural flavoring ingredients and did not contain artificial flavoring ingredients because that is what the representations said and implied.

141.   Plaintiff relied on the words, coloring, descriptions, layout, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

142.   Plaintiff was disappointed because she believed the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

143.   Plaintiff bought the Product at or exceeding the above-referenced price.

144.   Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

145.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

146.   The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

147.   Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

148.   Plaintiff is unable to rely on the labeling and representations not only of this Product, but for other similar water enhancers, because she is unsure whether those representations are truthful.

<u>Class Allegations</u>

149.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Alabama Class:** All persons in the State of Alabama who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Florida, Georgia, South Carolina, Tennessee, North Carolina, and Virginia who purchased the Product during the statutes of limitations for each cause of action alleged.

150.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

151.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

152.  Plaintiff is an adequate representative because her interests do not conflict with other members.

153.  No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

154.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

155.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

156.  Plaintiff seeks class-wide injunctive relief because the practices continue.

Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"), Fla. Stat. § 501.201 et seq.

(Consumer Protection Statute)

157.   Plaintiff incorporates by reference all preceding paragraphs.

158.   Plaintiff and class members desired to purchase a product that contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

159.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

160.   Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

161.   Plaintiff relied on the representations that the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

162.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

163.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

164.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

165.   Defendant intended that each of the members of the Consumer Fraud Multi-State

Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

166.   As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

167.   Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breach of Contract

168.   Plaintiff entered into a contract with Defendant for purchase of the Product.

169.   The terms of the contract provided that the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

170.   Defendant breached the contract because the Product did not meet the terms Plaintiff agreed to.

171.   Plaintiff was damaged by the breach, and those damages include the purchase price.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq</em>.

172.   The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

173.   Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

174.   Defendant knew the product attributes that potential customers like Plaintiff were

seeking and developed its marketing and labeling to directly meet those needs and desires.

175.  Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

176.  Defendant's representations affirmed and promised that the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

177.  Defendant described the Product as one which contained only natural flavoring ingredients and did not contain artificial flavoring ingredients, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

178.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

179.  This duty is based on Defendant's outsized role in the market for this type of Product, the most admired supermarket chain in the nation, known for its honesty, fairness, expertise, and values, with an established history of putting customers first.

180.  Plaintiff recently became aware of Defendant's breach of the Product's warranties.

181.  Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

182.  Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

183.  Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

184.  The Product did not conform to its affirmations of fact and promises due to

Defendant's actions.

185.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

186.   The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained only natural flavoring ingredients and did not contain artificial flavoring ingredients, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

187.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

188.   Defendant had a duty to truthfully represent the Product, which it breached.

189.   This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the most admired supermarket chain in the nation, known for its honesty, fairness, expertise, and values, with an established history of putting customers first.

190.   Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

191.   These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

192.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

193.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

194.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

195.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

196.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

197.  Defendant knew of the issues described here yet did not address them.

198.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

199.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   March 13, 2022

Respectfully submitted,

/s/Will Wright
The Wright Law Office, P.A.
Will Wright
515 N Flagler Dr Ste P300
West Palm Beach FL 33401-4326
Tel: (561) 514-0904
willwright@wrightlawoffice.com

Sheehan & Associates, P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080

spencer@spencersheehan.com

*Pro Hac Vice Application Forthcoming